UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

PAGAYA TECHNOLOGIES LTD, PAGAYA
TECHNOLOGIES US, LLC and PAGAYA
ACQUISITION TRUST VIII,

                    Plaintiffs,

    v.

KLARNA, INC. and KLARNA GROUP PLC,

                    Defendants.

No. 26-cv-00557

**COMPLAINT**

**Jury Trial Demanded**

Plaintiffs Pagaya Technologies Ltd. ("Pagaya"), Pagaya Technologies US, LLC ("Pagaya Technologies") and Pagaya Acquisition Trust VIII ("Pagaya Trust VIII") (each a "Plaintiff" and together, "Plaintiffs"), by and through their attorneys, Kobre & Kim LLP, for their Complaint against defendant Klarna, Inc. ("Klarna, Inc.") and Klarna Group plc ("Klarna plc") (each a "Defendant" and together "Klarna") in the above-captioned action, allege as follows:

**INTRODUCTION**

1.      As of 2022, Klarna, a Swedish firm, had tried and failed to profitably underwrite point-of-sale ("POS") term loans in the subprime segment of the United States consumer lending market.[1]  To tap into that technologically demanding and, if done right, lucrative segment of the market, Klarna needed a partner with technological expertise, economic wherewithal, and a willingness to invest hard and soft capital in the endeavor.  Pagaya, a New York-based, NASDAQ-listed company — ticker symbol PGY — is a market-leader in cutting edge financial technology (a.k.a. fintech), thus, precisely that partner.

2.      As it turned out, however, over the course of nearly four years, beginning in October 2022, Klarna distilled Pagaya's core underwriting technology for POS loans and then willfully misappropriated its trade secrets — the proprietary technological information, data, and techniques Pagaya licenses to its lending partners — in violation of federal and state law. And, while doing so, Klarna, Inc. also breached the agreements and commitments that undergirded its partnership with Pagaya.

3.      Klarna's objective, which only became clear very recently, was to absorb Pagaya's trade secrets, use them to build its own competing capabilities, and cut Pagaya out of the very

---

[1] Klarna refers to these types of point-of-sale term loans as its Fair Financing Product. For simplicity, the Complaint refers to this market segment as "subprime POS" and the loans in the segment as "subprime POS loans."

business Pagaya made possible for Klarna. While plotting this scheme, Klarna was at the same time misrepresenting to Pagaya an intention to expand the partnership, thus causing Pagaya to invest in a venture that, unbeknownst to Pagaya, had no real future. The game of "gotcha" began manifesting itself in late February 2026 and unfolded in March and April 2026.

4.      Pagaya's partnership with Klarna started in October 2022. And, after an initial exploratory phase — during which Pagaya invested substantial hard and soft capital to master the intricacies of the subprime POS lending market — Pagaya helped Klarna grow its subprime POS business dramatically.

5.      As it does with all of its partners, Pagaya provided Klarna with access to its proprietary and confidential information with the commitment that such information is protected by federal and state trade secret laws in the United States. On that basis, Pagaya entrusted Klarna ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████. The success of Klarna's partnership with Pagaya was driven by Pagaya's proprietary credit underwriting machine learning model and the data it generated, which Pagaya put over $100 million at risk to develop.

6.      For Klarna, access to Pagaya's trade secrets helped it succeed exactly where it had ██████████████████████████████████████████████████████████ Pagaya's model is a sophisticated, operationally validated, and commercially essential trade secret. The model's outputs — ████████████████████████████████████████████ ████████████████████████████████████████████████████, are the keys to successful subprime POS lending and the lifeblood of Pagaya's business.

3

7.    Since October 2022, Pagaya allowed Klarna ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████    Klarna was keenly aware of its legal duties.

8.    Believing that Klarna was acting in good faith and honoring its duties, a belief which turned out to be untrue, ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

9.    In September 2025, almost three years into the partnership, and fueled in significant part by Pagaya's contributions — which included enabling Klarna to launch a marquee partnership with Walmart — Klarna plc completed a $15.1 billion initial public offering on the New York Stock Exchange. The market recognized Pagaya's substantial contribution to Klarna's business; in fact, Klarna was immediately questioned about its utilization of Pagaya's underwriting technology. Klarna plc's CEO Sebastian Siemiatkowski downplayed Pagaya's importance to Klarna's success and claimed in a recorded interview that Klarna did not outsource its risk underwriting to Pagaya. Mr. Siemiatkowski was asked the following question and gave the following answer on the day of the offering, September 10, 2025:

> Q: So just so I understand Sebastian. So when you're when you're assessing the risks of making a loan to [a consumer], you're doing that. You're not outsourcing that.

A: Nope.[2]

That statement was untrue. ███████████████████████████████████

████████████████████████████████████████

10.   Meanwhile, Klarna had been lulling Pagaya into a false sense of security. To

illustrate: █████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████

11.   But, on February 19, 2026 — barely a month after ████████████████

████████████ — Klarna plc's CEO Mr. Siemiatkowski all but revealed that Klarna had used

Pagaya's trade secrets to improve its own underwriting model. Mr. Siemiatkowski claimed on

Klarna's earnings call that Klarna's United States fair financing underwriting was built on "***our***

proprietary underwriting systems that we've developed" (that claim was false) and reflected "the

knowledge we have built around risk management for the past 20 years" (also false).[3] On the same

call, Klarna plc's CFO Niclas Neglén revealed that Klarna's strategy was to "drive more of the

transactions within our own rails."[4]

12.   These statements in combination by Klarna's most senior officers reflect one

remarkable thing: Klarna improperly ███████████████████████████ and was now

---

[2] *Klarna CEO on IPO: We're building relationships with US consumers*, Yahoo! Finance (Sept. 10, 2025).
[3] *Klarna Q4 2025 Earnings Call Transcript*, Stock Analysis (Feb. 19, 2026).
[4] *Id.*

poised to cut Pagaya out of the subprime POS lending business Pagaya made possible.

13.    Klarna's ensuing actions underscore its intent. Just weeks after the February earnings call, Klarna pulled the plug ██████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████. Hence Klarna is now using Pagaya's trade secrets to provide the underwriting capability underpinning ███████████ as well as Pagaya's operational knowledge and proof-of-concept to structure and market that deal. Klarna has thus unlawfully stripped Pagaya of the rewards that Pagaya created.

14.    Teams led by Klarna plc's Chief Product & Design Officer David Fock and Klarna plc's Chief Credit Officer Arvind Varadhan ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

15.    Klarna's siphoning of Pagaya's trade secrets was deliberate but stealthy, while its recent actions and statements are loud and clear: █████████████████████████████ ██████████████████████. This brazen misconduct is unprecedented in Pagaya's experience with its other fintech partners.

16.    Pagaya brings this action to put an end to Klarna's misappropriation, and to recover damages for the economic harm it has suffered, including unjust enrichment and for exemplary damages provided by law for willful and malicious misconduct. Klarna has unjustly enriched itself

by using Pagaya's trade secrets to successfully enter the United States market, make itself a commercially attractive partner to merchants (such as Walmart), and build a consumer lending business line worth approximately $2 billion — made possible with Pagaya's trade secrets. The federal and state trade secret laws protect innovators like Pagaya who invest greatly in developing their trade secrets from unlawful interlopers like Klarna. Pagaya also seeks recourse against Klarna, Inc. for breaches of contract and other misconduct as detailed below.

## PARTIES

17.     Plaintiff Pagaya has its principal place of business in New York, New York and is incorporated under the laws of Israel. It is a leading technology-driven financial technology company that is working to revolutionize the lending and underwriting industry through artificial intelligence. It currently partners with more than 30 major lending institutions and platforms to expand access to credit for millions of Americans. Its capital base comprises more than 130 institutional investors and funding partners, among them some of the largest and most well-known financial institutions in the country. It deploys capital through securitizations, private funds and forward flow arrangements.

18.     Plaintiff Pagaya Technologies is a Delaware limited liability company whose sole member is Pagaya US Holding Company LLC. Pagaya US Holding Company LLC is a Delaware limited liability company whose sole member is Pagaya which, as noted above, has its principal place of business in New York, New York and is incorporated under the laws of Israel.

19.     Plaintiff Pagaya Trust VIII is a Delaware statutory trust whose sole member is Pagaya Structured Products LLC. Pagaya Structured Products LLC is a Delaware limited liability company whose sole member is Pagaya US Holding Company LLC. Pagaya US Holding

7

Company LLC's sole member, as noted above, is Pagaya.[5]

20.     Defendant Klarna, Inc. holds itself out as a fintech company that operates a consumer lending and payments platform through which loans are originated and sold. It is a Delaware corporation with its principal place of business in Columbus, Ohio.

21.     Defendant Klarna plc holds itself out as a fintech company and digital bank that operates as a payment provider. It is a limited liability company incorporated in England and Wales with its registered office in London, United Kingdom and its headquarters in Stockholm, Sweeden. It is publicly traded on the New York Stock Exchange — ticker symbol KLAR. According to Klarna plc's 2025 Form F-1 Registration Statement filed with the United States Securities and Exchange Commission (the "SEC"), Klarna, Inc. is Klarna plc's "U.S. operating subsidiary," described also as its "main U.S. subsidiary" and it agent for service of process.

## JURISDICTION AND VENUE

22.     This Court has personal jurisdiction over Klarna, Inc. because it is incorporated in the State of Delaware and is therefore subject to general personal jurisdiction in this District.

23.     This Court has personal jurisdiction over Klarna plc because it is a direct co-perpetrator of the wrongful conduct giving rise to this action. Klarna plc participated in, directed, authorized and/or ratified the acts of misappropriation committed through Klarna, Inc. By directing and benefitting from the wrongful actions of Klarna, Inc., a Delaware corporation, Klarna plc aimed its wrongful conduct at Delaware and has purposefully availed itself of the privilege of conducting activities in this forum.

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§

---

[5] Because a Delaware statutory trust is a distinct entity that can bring and be subject to legal actions, it takes the citizenship of each of its members. *See, e.g.*, *MSR Tr. v. Nationstar Mortg. LLC*, 2021 WL 4200720 (S.D.N.Y. Sept. 15, 2021), *report and recommendation adopted*, 2022 WL 392405 (S.D.N.Y. Feb. 9, 2022).

1331 and 1836(c), as this action arises under a federal statute, the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*

25.     The Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1367 because the state law claims in this action form part of the same case or controversy as the Defend Trade Secrets Act claim.

26.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) as well, because there is a complete diversity of citizenship among the parties and the amount in controversy exceeds seventy-five thousand ($75,000), exclusive of costs and interests.

27.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (c)(2), because Klarna, Inc. is incorporated in Delaware and is therefore deemed to reside in this District for venue purposes. Venue is proper as to Defendant Klarna plc in any district, including this District, as a foreign corporation.

## **FACTUAL ALLEGATIONS**

**A.     Klarna Enters Into A Partnership with Pagaya.**

28.     Pagaya and Klarna began their formal business partnership in 2022 when — ████

████████████████████████████████████████████████████

████████████████████████ — Klarna needed a partner with high-volume, high-speed underwriting expertise to expand its business in that lucrative lending segment.

29.     Point-of-sale lending (POS also called "Buy Now, Pay Later" term loans) is a branch of consumer microlending that exploded globally during the 2017-2021 e-commerce boom, fueled by online shopping during the COVID era.[6] Unlike traditional forms of lending, customers can use POS loans to complete online purchases by borrowing the amounts needed in real time.

---

[6] Caitlin Mullen, *Breaking down buy now, pay later*, Payments Dive (Nov. 3, 2023).

Within a matter of seconds, a customer can apply for a loan, and the lender can process the application and pay the merchant (if the application is accepted). The customer then repays the lender in installments over time, typically with interest. All of this is done electronically, online, and seamlessly from the borrower's perspective.

30.     In 2024, an estimated 86.5 million people in the United States used POS loans. In 2025, that number rose to 128 million consumers,[7] and more than half of Americans have used POS lending at least once.[8] The majority of these POS borrowers have subprime or deep subprime credit,[9] and are often underserved by credit card companies and other sources of financing.[10] This POS borrower segment represents a large proportion of the consumer base for large merchants, such as Walmart. Thus, the ability of POS lenders to serve this borrower segment — like Klarna did in utilizing the Pagaya services — is crucial to those merchants.

31.     To be successful — or even financially viable — POS lenders must be able to precisely evaluate the credit profiles of high volumes of potential borrowers, their risk of non-payment, and the terms of their loans, and make lending decisions within seconds. As discussed below, Pagaya spent years and invested millions developing a unique and innovative technology solution to these very problems.

32.     ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[7] *BNPL and Point-of-Sale Lending: Insights for Lenders and Furnishers*, TransUnion (Aug. 28, 2025).
[8] Kateryna Kikidzhan & Serhii Leleko, *Buy Now, Pay Later Technology (BNPL): A Guide to Data-Drive Lending*, SPD Technology (Dec. 30, 2025).
[9] Jeff Larrimore, et al., *"The Only Way I Could Afford It:" Who Uses BNPL and Why*, The Federal Reserve (Dec. 20, 2024).
[10] *Id.*



. Klarna's unlawful misappropriation of those trade secrets beyond the circumscribed confines of the License Agreement violates federal and state law.

**B.    The License Agreement.**

11









███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

### C.     Pagaya's Trade Secrets

50.     Pagaya's Trade Secrets fall into three core categories: (i) information concerning Pagaya's Model, including the Model itself, Pagaya's techniques used to train and improve the Model (and the evolution of those techniques over the Model's development history), and the Outputs and training data accumulated over four years of program operation; (ii) Pagaya's validated operational knowledge concerning subprime POS lending at scale in the United States; and (iii) Pagaya's validated structural knowledge concerning subprime POS loan financing transactions such as securitizations and forward-flows. License Agreement § 1.33. These Trade Secrets are mutually reinforcing: ██████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

### 1.  Pagaya's Model, Training Information, Model Development History, and Model Data.

51.     At the heart of Pagaya's Trade Secrets is its proprietary machine learning credit underwriting Model, which Pagaya developed and fine-tuned for underwriting POS consumer loans to subprime borrowers. License Agreement at 1 (████████████████████████████

██     █████████████████████████████████████████████

███████████████████████████████████████████████████





53.     **The Model and Its Development.** At a high level, for any applicant processed by the Model:

55.     The Model — including its programming, functionality, logic, and inputs — are among Pagaya's most valuable trade secrets,

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████

56.     To develop the Model, Pagaya made specific design and configuration decisions implemented over time by iteratively training and improving the Model. This development history is captured in development documents showing the Model's evolution to its current design. Like the Model itself, this development history is also a closely guarded trade secret of Pagaya (the "Model Development History").

57.     Not only has Pagaya invested tens of millions of dollars in hard capital to build, train, and improve the Model, but it also put over $100 million of additional dollars at risk to refine the Model. This is because, for credit underwriting in particular, generating the actual performance history data used to train and improve a predictive model through trial and error over time requires lending actual money to actual borrowers. Some loans will inevitably fail, and some will succeed, as is necessary for the model to learn. This is particularly true in the subprime POS segment of the market, given the inherent riskiness of those borrowers. Pagaya's decisions and refinements over time are reflected in the Model Development History.

58.     Pagaya has kept the Model and its Development History a closely guarded secret through a variety of contractual protections, █████████████████████████████████████████████████████████████████████████████████████████████████████ as well as technical access controls limiting access to the Model Data and prohibiting access to its underlying code and parameters. The Model and its Development History have never been publicly disclosed and its design, parameters, and development methodology are not readily ascertainable from any public

18

source.

59.    The specific Model development documents that reflect the Model Development History were also never shared with Klarna or any other non-bank partner ██████████

████████████████████████████████████████████████████

████████████████████████████████████████

60.    The Model and Model Development History are Trade Secrets that derive substantial independent economic value from not being generally known or readily ascertainable. Klarna sought out and contracted for limited access to the Model, reflecting that it has significant economic value. This is also reflected by Pagaya's and Klarna's success from using the Model, and their superior profitability when compared to competitors in the same market who do not have access to the Model or its outputs. Further, the Model and its Development History derive substantial independent economic value from not being generally known or readily ascertainable as evidenced by the fact that competitors have not developed a tool as good as the Model. Disclosure of these Trade Secrets to Pagaya's competitors would allow them to avoid substantial development costs that they would otherwise incur if engaging in legitimate independent development.

61.    **The Model Data**. As significant as the Model and the Model Development History itself — and in certain respects more significant for purposes of this action — are the data it has generated across years of program operation (the "Model Data").

62.    ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



_____

[13] The exact scope of information sent to Klarna changed over time, but it was in this form for most of the partnership.

66.     Pagaya has not publicly disclosed its Model, Model Development History, or Model Data, and has protected their secrecy with technical (for example, those discussed in Section B) access and use protections limiting their disclosure and use strictly to what was reasonably required to further Pagaya's business partnerships.

67.     ████████████████████████████████████████

68.     The Model Data — ███████████████████████ — are immensely valuable:

21



**2. Pagaya's Validated Operational Knowledge and Proof of Concept for Subprime Point-of-Sale Lending at Scale.**

69. Pagaya's Trade Secrets also include its validated and proprietary operational proof of concept and proprietary techniques and knowledge for profitably underwriting POS consumer loans to borrowers with subprime credit scores at scale ("Pagaya's Operational Knowledge").

70.

71. In short, Pagaya assembled a tried-and-tested operational roadmap for this market segment, driven and validated

███████████████████████████████████████████████████

███████████████████████████████

72.    Pagaya's Operational Knowledge is not widely known or readily ascertainable. ███

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████

73.    Pagaya's Operational Knowledge derives substantial independent economic value from not being generally known or readily ascertainable. ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████

**3. Pagaya's Validated Structured Finance Knowledge & Proof of Concept for Subprime Point-of-Sale Lending.**

74.     Pagaya's third category of trade secrets is its proprietary information developed through structuring subprime POS loans into securitization (a.k.a. asset-backed securities or "ABS") and forward flow transactions. The trade secret is not how to execute these transactions generally; rather, it is Pagaya's validated information concerning the subprime consumer loan pools that underlie those transactions and the non-public techniques and commercial terms involved in structuring them ("Pagaya's Structural Knowledge"). These secrets include:



75.     Pagaya accumulated and validated its Structural Knowledge through its experience issuing ABS, working with rating agencies, and achieving ██████████████████

██████████████████████████████████████████████████████

24

██████████████████████████████████████████████████

76.     Pagaya's Structural Knowledge was not known or readily ascertainable; rather, Pagaya developed it through actual transactions, including two point of sale loan securitizations (the "<u>First Securitization</u>" and the "<u>Second Securitization</u>") that earned investment-grade ratings from Kroll Bond Rating Agency based on demonstrated program performance. Pagaya has not publicly disclosed its Structural Knowledge at the level of specificity that would enable a market entrant to replicate it without independently operating in this space, and has protected its secrecy with technical and contractual access and use protections limiting their disclosure and use strictly to what was reasonably required to further Pagaya's partnership objectives with Klarna. ██████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

77.     Pagaya's Structural Knowledge derives substantial independent economic value from not being generally known or readily ascertainable because a market participant entering the market without it would have to develop it independently, ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



### 4. Pagaya's Reasonable Measures to Protect Its Trade Secrets.

78.     Pagaya took reasonable measures to maintain the secrecy of each of its Trade Secrets described above, including the following, individually and in combination:

---

[14] "API" or Application Programming Interface refers to a mechanism that enables two software components to communicate.

26

f.

79.     None of Pagaya's Trade Secrets have been publicly disclosed in its SEC filings, investor communications, press releases, or any other public medium at the level of specificity that constitutes the trade secret. Pagaya's Trade Secrets remain non-public and their secrecy has been maintained through the measures described above throughout the duration of its business partnership with Klarna.

**D.      Klarna's Access to Pagaya's Trade Secrets**

80.     Over several years of operational integration, Klarna received continuous access to Pagaya's Trade Secrets, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

81.     Though Klarna's access to the Trade Secrets was limited to what was reasonable in light of the partnership's objectives and nature, and the protections the parties had agreed to, Klarna's access to the Pagaya Trade Secrets was sustained. ████████████████████████████████████████████████████████████████████████

27

██████████████████████

82.    The proprietary information that Klarna did access enabled it to improperly and unfairly compete with Pagaya and misappropriate its Trade Secrets. That is what Klarna did here.

83.    Klarna received Pagaya's Trade Secrets through the channels described below, ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████

- **Model Data**: ████████████████████████████████████

    ████████████████████████████████████████

    ████████████████████████████████████████

    ████████████████████████████████████████

    ████████████████████████████████████████

    ████████████████████████████████████████

    ████████████████████████████████████████

    ████████████████████████████████████████

    ██████████████████████

- **Personnel Bridges.** Teams led by Klarna plc's Chief Product & Design Officer David Fock and its Chief Credit Officer, Arvind Varadhan, served as operational links █████████████████████████████████████

    ████████████████████████████████████████

    ████████████████████████████████████████

    ████████████████████████████████████████

    ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

84.    The significance of Klarna's access to the Trade Secrets was a function not only of its breadth across these multiple channels but of its duration and operational depth. ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

85.    Additionally, over the course of the partnership, Pagaya's and Klarna's senior leadership met in the context of several executive business reviews. ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

86.

In a nutshell, Klarna's access was conditionally authorized; but Klarna's use was not and was therefore unlawful.

87.    Pagaya in turn worked closely with Klarna to drive substantial growth in Klarna's United States lending business. That collaboration included regular, high-level engagement between the parties' leadership, including numerous executive-level meetings and business reviews — at least six of which were held in London and New York.

88.    As the partnership advanced, ██████████████████████████

███████████████████████████████████████████

██████ Klarna executives described Pagaya as a strategic growth partner and ██████████

███████████████████████████████████████████

████████████████

89.    Further, the parties implemented structured financing arrangements to enable Pagaya to purchase loans at larger scale. ████████████████████████

███████████████████████████████████████████

---

15 ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████

████████ ████████████████████████████

### E.    Klarna's Massive Scaling in 2025

90.    By 2025, Klarna was actively collaborating with Pagaya at increasing scale, with Pagaya purchasing and financing a growing volume of loans generated through Klarna's platform.

████████████████████████████████████████████████

████████████████████████████

██    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████    Klarna's relationship with the truth, meanwhile, was waning. For example, when Klarna announced its groundbreaking partnership with Walmart in March 2025, Klarna plc's CEO, Mr. Siemiatkowski, called it "a huge vote of confidence" for Klarna's capabilities.[16]

92.    By May 2025, Pagaya publicly announced the launch of its point of sale securitization program in partnership with Klarna, under which Pagaya would finance over $1.0 billion of Klarna loan purchases. As the *Wall Street Journal* saw it, Pagaya's partnership was "fueling expansion at Klarna" ahead of the company's expected initial public offering.[17]

93.    Pagaya was thus enabling Klarna to turbocharge its United States lending business, which had now become Klarna's largest market. That growth directly contributed to Klarna's strong financial performance in the period leading up to its initial public offering (IPO), which valued the company at approximately $15 billion in September 2025.

94.    Klarna's relationship with the truth, however, continued to deteriorate. For

---

[16] *Klarna Announces Partnership with OnePay to Exclusively Power Installment Loans at Walmart in the U.S.*, OnePay (Mar. 17, 2025).
[17] Matt Wirz, *The AI Middleman Expanding in the Consumer-Bond Bonanza*, Wall St. J. (May 22, 2025).

example, in its disclosure statements filed with the SEC for the IPO, Klarna described its underwriting capabilities as its own[18] while, in reality, on information and belief, Klarna was distilling Pagaya's Model Data and other Trade Secrets, ultimately for its own intended use.

**F.      Klarna's November 2025 Commitments to Pagaya**

95.      Between May and November 2025, Klarna lured Pagaya into protracted negotiations that would purport to deepen their relationship, creating a false sense of security for Pagaya's continued investment of hard capital and proprietary information into the relationship.

96.      On November 7, 2025, Pagaya Trust VIII, Klarna, Inc., and WebBank executed the Loan Sale Agreement (the "Loan Sale Agreement"),

---

[18] Klarna Group Plc September 10, 2025 SEC Disclosure Statements, SEC (Sept. 10, 2025).

33



██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

██    ██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████ .

103.    Klarna, Inc.'s participation was indispensable to finalize and execute these transactions, which depended on continued flow of loans from Klarna's platform and Klarna's cooperation in transferring and securing financing for these loans. Klarna understood that, without its participation, the transactions could not proceed.

104.    Klarna was fully aware of, and indeed had previously exploited, its centrality to these financing transactions. In a prior securitization in May 2025, Klarna withheld its participation at the final stage in a successful effort to extract economic concessions before ultimately allowing the deal to proceed. ██████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

105.    Throughout this process, Klarna presented itself as fully committed to the partnership. It participated in negotiations, reviewed and shaped transaction documents, ███████████████████, and worked through deal terms — reinforcing the understanding that it intended to close.

106.    In January 2026, Klarna provided Plaintiffs with detailed projections █ ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████



107.    Those projections assumed the execution of multiple financing transactions

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████. Klarna provided those projections knowing that Plaintiffs would rely on them █

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

**G.    Klarna, Inc.'s Improper Repudiation of Its Commitments.**

108.    For a short while, Klarna appeared to be deeply involved with the contemplated transactions (███████████████████████████████████████), participating in negotiations, engaging in the deal structure, and reviewing and shaping transaction documents as the deals progressed toward execution.

109.    As of March 2026, ████████████████████████████████████████████ had progressed to advanced stages, and their closing depended ███████████████████████ ████████████████████████████████████████████████████████

110.    In a series of calls on March 6 and March 9, 2026, Klarna CFO Neglén tried to delay the transactions — citing a need for executive board review and seeking additional economic concessions, but, on March 10, Klarna's team confirmed that the ███████████████ was "good to move forward" to WebBank, which reiterated this same message to Pagaya. At this point, near-final agreements had been circulated, and the parties were working toward closing within days.

111.    As it turned out, however, Klarna, Inc. had not entered into these agreements in good faith and was, ████████████████████████████████████████████ ████████████████████████████████████. Klarna concealed these efforts from Plaintiffs while seemingly continuing to advance ██████████████████████████ ██████████s toward closing, creating the false impression that it intended to follow through on those deals and fulfill its contractual obligations. When supposed "delays" arose, Klarna attributed them to logistical, timing, or internal considerations, withholding the truth that it was actively negotiating a replacement arrangement and preparing to abandon the transactions.

112.    By all appearances, having extracted Pagaya's Trade Secrets, Klarna used Plaintiffs — and the advanced state of the █████████████████████████████████ — as

leverage to secure favorable terms with another financing partner, while now positioning itself to walk away from Plaintiffs.

113.    In late March, Klarna, Inc. abruptly revealed that it had closed negotiations for an alternative forward-flow transaction with another counterparty. Then, on March 25, 2026, also abruptly, Klarna, Inc. notified Pagaya that it would cease to operate under the License Agreement and the Commitment Agreement, purporting to terminate them on 180-days' notice, and stated it would not enter into any new financing agreements with Pagaya, ████████████████████████ ████████████████████████████████████████

114.    This announcement came without prior notice and without any transaction-specific explanation. Rather than engage with Plaintiffs in good faith, Klarna proposed new, unworkable terms that were ████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████. When Plaintiffs did not agree to these new and unworkable terms, Klarna, Inc. withdrew from further negotiations, refusing to participate in the very financing transactions that it lured Pagaya into and was obligated to support.

115.    ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████.

116.    Plaintiffs have incurred millions of dollars in legal and advisory fees and hundreds

of hours devoted to structuring, negotiating, and documenting those transactions; █████████ ███████████████████████████████████████████████████████████████; and the loss of the securitization and forward-flow financing infrastructure those transactions were designed to establish.

117.    Those harms are inevitable, given that Klarna was not only the primary beneficiary of these transactions, but also that Klarna, Inc. was sole servicer and supplier of the loans needed to execute and operate them, which further underscores the intentionality of that misconduct.

**H.    Klarna's Willful Misappropriation of Pagaya's Trade Secrets.**

118.    The events demonstrate — or at least create a very strong inference — that Klarna willfully misappropriated Pagaya's Trade Secrets.

119.    Before October 2022, Klarna lacked the technical capability to profitably underwrite subprime POS loans. In October 2022, Klarna engaged Pagaya ████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████.

120.    Between 2022 and 2024, Pagaya underwrote loans from the Klarna platform, while providing Klarna with access to its Model Data pursuant to the Limited License. By September 2024, the partnership expanded with Klarna and Pagaya entering into broader transactions (described above) through which Pagaya financed and acquired subprime POS loans from Klarna's platform, thus providing balance sheet relief and additional capital to Klarna. Before Pagaya, Klarna had not previously participated in securitizing subprime POS loans.

121.    As early as 2024, Klarna had, on information and belief, begun to use Pagaya's Model Data to train and improve its own underwriting model in violation of the Limited License.

Meanwhile, by 2025, or earlier, Klarna was courting Walmart, one of the country's largest merchants focused on the very capabilities Pagaya was providing.

122.    In addition, in May 2025, Pagaya announced its point-of-sale securitization program, with Klarna as the sole originator and servicer, to drive more Klarna loan volume through Pagaya. ███████████████████████████████████████████████████████████████████

███████ .

123.    By September 2025, now boosted by the volumes enabled by the Pagaya's securitization program and underwriting, as well as the Walmart deal, Klarna plc completed its IPO. Immediately after the IPO, when asked about Klarna's relationship with Pagaya, Klarna plc's CEO, Mr. Siemiatkowski, publicly downplayed Pagaya's contributions to Klarna's business and claimed that Klarna did its own underwriting while, in fact, Klarna was outsourcing underwriting to Pagaya.

124.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

125.    On February 19, 2026, Klarna plc's Mr. Siemiatkowski told Wall Street analysts — falsely — that Klarna's underwriting was built on "our proprietary underwriting systems that

we've developed" and reflected "the knowledge we have built around risk management for the past 20 years."[19] On the same call, Klarna plc's CFO Mr. Neglén stated Klarna's strategy was to "drive more of the transactions within our own rails."[20] Hence, Klarna was now publicly touting the underwriting capabilities and "rails" it lacked without Pagaya's Trade Secrets.

126. Those statements are simply irreconcilable with Klarna's capabilities or its history in the United States absent misappropriation from Pagaya: ███████████████████████

███████████████████████████████████████████████████

███████████████████████████████

127. Before Pagaya, Klarna lacked the capability to profitably underwrite subprime POS loans and to structure transactions that would remove those loans from its balance sheet, transferring its risk and replenishing its capital. For years after continuously accessing Pagaya's Trade Secrets, Klarna has abruptly terminated its relationship with Pagaya and appears to have newfound capabilities in subprime POS loan underwriting and transactions.

128. Klarna's newfound capabilities map squarely onto the Pagaya Trade Secrets, which Klarna accessed through its Limited License. Klarna had motive and opportunity to — and, on information and belief, did — use Pagaya's Trade Secrets to improperly develop its own internal capabilities to underwrite subprime POS loans, operate in the subprime POS lending market, and execute securitization and forward-flow transactions, so that it could cut Pagaya out of the economics while having unlawfully taken Pagaya's Trade Secrets.

129. Klarna offered no legitimate reason ███████████████████████ ███████████████ Nor did Klarna possess legitimate, independent capabilities without unlawfully using Pagaya's Trade Secrets. Rather, Klarna — by all appearances — used Pagaya's

---

[19] *Klarna Q4 2025 Earnings Call Transcript*, Stock Analysis (Feb. 19, 2026).
[20] *Id.*

Model Data to develop a competing underwriting model, Pagaya's Operational Knowledge to compete in the subprime POS lending market, and Pagaya's Structural Knowledge ███████████ ████████████████████████████████████████████████████

130.    Klarna's misappropriation of Pagaya's Trade Secrets was and continues to be unlawful, as Pagaya did not consent to such use.

131.    This misappropriation by Klarna was willful and malicious. Klarna did not inadvertently use Pagaya's Trade Secrets without consent. It did so knowingly and surreptitiously, motivated by the desire to acquire capabilities it lacked without investing or risking what was required for independent development. ███████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████ ███     ███████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████████

133.    Moreover, Klarna's decision to develop competing underwriting infrastructure, enter the subprime POS market itself, ██████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ reflects a considered corporate decision to publicly claim Pagaya's works as Klarna's own.

41

**I.      Harm to Pagaya & Klarna's Unjust Enrichment.**

134.    As a direct and proximate result of Klarna's misappropriation, Pagaya has suffered and continues to suffer actual damages, including the loss of the competitive exclusivity of its Trade Secrets, the loss of the commercial relationship that was the primary vehicle through which Pagaya deployed those Trade Secrets, and the loss of future revenue from a partnership that Klarna was obligated to maintain well into the future.

135.    Klarna has been unjustly enriched by avoiding the development costs, investment, and iterative program investment that would have been required to independently develop the capabilities it misappropriated — costs that Pagaya bore entirely over four years of program operation, which are considerably higher when evaluated on a risk-adjusted basis, from the perspective of a market entrant with Klarna's capabilities as of 2022.

136.    Klarna is further generating revenue and profits ███████████████████ that are directly attributable to the misappropriation of Pagaya's Trade Secrets. Pagaya is entitled to recover its actual losses, Klarna's unjust enrichment, and, given the willfulness of the misappropriation, exemplary damages, and attorneys' fees.

**J.      The Commitment and Loan Sale Agreements.**





**FIRST CAUSE OF ACTION**

**Misappropriation of Trade Secrets Under the Defend Trade Secrets Act 18 U.S.C. § 1836 et seq. (Pagaya Against Klarna, Inc. and Klarna plc)**

143.    Pagaya repeats and realleges each and every allegation set forth above as if fully set forth herein.

144.    The Defend Trade Secrets Act 18 U.S.C. § 1836 et seq. ("DTSA") provides a federal civil cause of action for misappropriation of trade secrets related to a product or service used in, or intended for use in, interstate or foreign commerce. Pagaya's Trade Secrets are "Trade Secrets" under the DTSA.

145.    Pagaya owns and has continuously held protectable trade secrets within the meaning of 18 U.S.C. § 1839(3). Each of the categories of Trade Secrets described above constitutes "information" that derives independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, persons who could obtain economic value from its disclosure or use.

146.    The independent economic value of Pagaya's Trade Secrets is evidenced by, among other things: the performance differential between Pagaya's model and publicly available credit benchmarks and Pagaya's investment to create its Trade Secrets; the fact that Klarna could not profitably enter this borrower segment before the partnership; and the willingness of institutional investors to provide structured financing to Klarna following its absorption of Pagaya's commercial knowledge.

147.    As described above, Pagaya has taken reasonable technical and contractual measures to maintain the secrecy of its trade secrets and to limit any disclosure of its proprietary information to the operational needs of the parties' joint program. None of the specific information constituting Pagaya's Trade Secrets has been publicly disclosed at the level of granularity that

44

constitutes the trade secret.

148.   Pagaya's Trade Secrets are related to services used in, and intended for use in, interstate commerce. Pagaya's Model is deployed to evaluate consumer loan applications submitted through Klarna's POS lending platform, which operates across the United States. The program generated and financed consumer loans in multiple states, and the securitization transactions for which Pagaya's Structural Knowledge was used involved institutional investors and capital markets participants across multiple states and internationally. The interstate commerce nexus is direct and is not in dispute.

149.   As alleged in detail above, Klarna misappropriated Pagaya's Trade Secrets within the meaning of 18 U.S.C. § 1839(5)(B)(ii)(II) by disclosing and using Pagaya's Trade Secrets without consent, at a time when Klarna knew or had reason to know that its knowledge of the trade secrets had been acquired under circumstances giving rise to a duty to maintain their secrecy and limit their use as permitted by Pagaya. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████.

150.   Far from being a passive recipient who might have been unaware of those obligations, Klarna negotiated them, Klarna, Inc. executed the agreements that contained them and they operated under them for years.

151.   The License Agreement, entered into in Delaware through Klarna, Inc., provided Klarna, Inc. with access to Pagaya's Trade Secrets. Klarna plc then utilized its access to the Trade Secrets through Klarna, Inc. for development of competing products. This is evident from the fact that Klarna plc's Arvind Varadhan and David Fock acted as the bridge between teams ████████

███████████████████████████████████████████████████

152.    Klarna's misappropriation is detailed above and expected to be further evidenced by its own internal documents.

153.    Klarna's misappropriation consists of at least (i) using Pagaya's Model Data to develop competing credit model capabilities; (ii) using Pagaya's Operational Knowledge to enter markets without Pagaya on Klarna's "own rails" while not incurring the costs of legitimate independent development; and (iii) using Pagaya's Structural Knowledge by first learning from Pagaya and then using those learnings to execute competing transactions replacing transactions with Plaintiffs to which Klarna had already committed.[21]

154.    Klarna's misconduct as detailed above constitutes "improper means" within the meaning of 18 U.S.C. § 1839(6)(A), supporting misappropriation by use of a trade secret known or that should have been known to have been acquired by improper means.

155.    Klarna's misappropriation was willful and malicious within the meaning of 18 U.S.C. § 1836(b)(3)(C). On information and belief, Klarna knowingly used Pagaya's proprietary data for Klarna's own credit model development. Klarna was also well aware of the mechanisms through which proprietary data designated as trade secrets can be misappropriated through unlawful distillation. Despite its awareness and sophistication, Klarna engaged in precisely this type of deliberate and improper misappropriation.

156.    Klarna's decision to develop competing underwriting infrastructure, enter the subprime POS market independently, ███████████████████████████ using Pagaya's absorbed knowledge, while simultaneously representing to Pagaya that the partnership was proceeding, compounds the willfulness.

---

[21] *Klarna Q4 2025 Earnings Call Transcript*, Stock Analysis (Feb. 19, 2026).

157.    As a direct and proximate result of Klarna's misappropriation, Pagaya has suffered and continues to suffer damages, including: actual losses from the destruction of the partnership through which Pagaya deployed its Trade Secrets, including the costs incurred to advance the partnership based on the expectation of future revenue; lost future revenue; the loss of the competitive exclusivity of Pagaya's Trade Secrets; and the costs of this litigation. Also, Klarna has been unjustly enriched by avoiding the development costs, investment, and operational investment that independent development of comparable capabilities would have required.

158.    Pagaya is entitled to:

      a.  an award of damages for actual loss and unjust enrichment pursuant to 18 U.S.C. § 1836(b)(3)(B)(i), in an amount to be determined at trial;

      b.  in the alternative, a reasonable royalty for Klarna's unauthorized disclosure or use of Pagaya's trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(B)(ii);

      c.  an award of exemplary damages in an amount up to twice the damages awarded under (a) or (b) above, pursuant to 18 U.S.C. § 1836(b)(3)(C), on account of Klarna's willful and malicious misappropriation;

      d.  an award of reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D);

      e.  injunctive relief to prevent any further use or disclosure of Pagaya's trade secrets, pursuant to 18 U.S.C. § 1836(b)(3)(A), including an injunction requiring Klarna to cease operation of any credit model,

commercial lending program, or securitization structure that was developed or is operated using Pagaya's trade secrets; and

f.    such other and further relief as the Court deems just and proper.

## SECOND CAUSE OF ACTION

**Misappropriation of Trade Secrets Under the Delaware Uniform Trade Secrets Act 6 Del. C. § 2001 et seq. (Klarna Against Klarna, Inc. and Klarna plc)**

159.    Pagaya repeats and realleges each and every allegation set forth above as if fully set forth herein.

160.    The Delaware Uniform Trade Secrets Act ("DUTSA"), 6 Del. C. § 2001 et seq., provides a civil cause of action for the misappropriation of trade secrets. Courts in this District regularly analyze DTSA and DUTSA claims in parallel, as the statutes provide materially identical elements and remedies.

161.    Pagaya's Trade Secrets are "Trade Secrets" under the DUTSA. Pagaya owns and has continuously held protectable trade secrets within the meaning of 6 Del. C. § 2001(4). Each of the three categories of Trade Secrets described above constitutes information that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of reasonable efforts to maintain its secrecy. 6 Del. C. § 2001(4)(a)–(b).

162.    The existence and independent economic value of Pagaya's Trade Secrets, and Pagaya's reasonable efforts to protect their secrecy, are as alleged in the First Cause of Action above and in the Factual Allegations, which are incorporated herein by reference.

163.    The relationship between Klarna, Inc. and Klarna plc which Klarna utilized to access the Trade Secrets and use them to develop a competing product is alleged in the above.

48

164. Klarna misappropriated Pagaya's Trade Secrets within the meaning of 6 Del. C. § 2001(2)(b)(ii)(B), as detailed above.

165. Klarna's misconduct as detailed above constitutes acquisition or use of Pagaya's trade secrets by "improper means" within the meaning of 6 Del. C. §§ 2001(1) and 2001(2)(a).

166. Klarna's misappropriation was willful and malicious within the meaning of 6 Del. C. § 2003(b), for the same reasons set forth in the First Cause of Action above.

167. As a direct and proximate result of Klarna's misappropriation, Pagaya has suffered and continues to suffer damages as alleged in the First Cause of Action above. Pagaya is entitled to:

     a. an award of damages for actual loss and unjust enrichment pursuant to 6 Del. C. § 2003(a), in an amount to be determined at trial;

     b. in the alternative, a reasonable royalty for Klarna's unauthorized use of Pagaya's trade secrets pursuant to 6 Del. C. § 2003(a);

     c. an award of exemplary damages in an amount up to twice the damages awarded under (a) or (b) above, pursuant to 6 Del. C. § 2003(b), on account of Klarna's willful and malicious misappropriation;

     d. an award of reasonable attorneys' fees pursuant to 6 Del. C. § 2004;

     e. injunctive relief pursuant to 6 Del. C. § 2002 to prevent any further use or disclosure of Pagaya's trade secrets, including an injunction requiring Klarna to cease any credit model development, consumer lending program, or securitization structure that was built or is operated using information misappropriated from Pagaya, continued

for such period as may be necessary to eliminate the commercial advantage Klarna has derived from the misappropriation; and

f.   such other and further relief as the Court deems just and proper.

## THIRD CAUSE OF ACTION

### Breach of License Agreement (Pagaya Against Klarna, Inc.)

168.   Pagaya repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

169.   The License Agreement is a valid and enforceable contract among Pagaya, Klarna, Inc., and WebBank.

170.   Pagaya has complied with all material provisions of the License Agreement.

171.   For the reasons detailed above, Klarna, Inc. willfully breached (at least) Sections ██████████████████████████████████████

172.   As a direct and proximate result of Klarna, Inc.'s willful breaches of the License Agreement, Klarna, Inc. has caused irreparable harm to Pagaya and/or Pagaya has suffered substantial money damages in an amount to be determined at trial.

173.   ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████.

## FOURTH CAUSE OF ACTION

### Breach of Loan Sale Agreement — Failure to Use Commercially Reasonable Efforts (Against Klarna, Inc.)

174.   Pagaya Trust VIII repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

175.    The Loan Sale Agreement is a valid and enforceable contract among Pagaya Trust VIII, Klarna, Inc., and WebBank.

176.    Pagaya Trust VIII has complied with all material provisions of the Loan Sale Agreement.

177.    For the reasons detailed above, Klarna, Inc. breached ███████████████ ██████

178.    With respect to securitization transactions specifically, █████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████

179.    Klarna, Inc.'s cooperation obligation was essential to Pagaya Trust VIII's securitization transactions, which could not close without it

180.    On March 25, 2026, Klarna, Inc. breached this obligation by refusing to cooperate in any further financing transactions. Klarna, Inc.'s refusal was not based on any legitimate transaction-specific issue; and Klarna, Inc. had previously entered into substantially identical securitizations.

181.    Knowing that Plaintiffs had committed substantial resources in reliance on Klarna, Inc.'s participation, Klarna, Inc. nevertheless withdrew thus breaching the agreement.

182.    ████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████. After Plaintiffs promptly eliminated that purported issue, however, Klarna continued to deny its cooperation, confirming that its purported reasons were pretextual and its breach willful.

183.    As a direct and proximate result of Klarna, Inc.'s breach, Plaintiffs have suffered damages in an amount to be determined at trial.

51

## **FIFTH CAUSE OF ACTION**

**Breach of Commitment Agreement (Pagaya Technologies against Klarna, Inc.)**

184. Pagaya Technologies repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

185. The Commitment Agreement is a valid and enforceable contract between Pagaya Technologies and Klarna, Inc.

186. Pagaya has complied with all material provisions of the Commitment Agreement.

187. Klarna, Inc. has breached the terms of the Commitment Agreement as set forth below and improperly attempted to repudiate it.

### **Klarna's Repudiation of the Agreement's Term.**

188. The Commitment Agreement sets forth a specific term and limited circumstances under which either party may terminate.





194.   On March 25, 2026, Klarna, Inc. attempted to repudiate the Commitment Agreement's term, ████████████████████████████████████████████

████████████████████████

███   ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

███   ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

197.   Klarna, Inc.'s repudiation was undertaken without any legitimate contractual basis, and, on information and belief, was motivated by the desire to improperly replace Pagaya after

misappropriating its Trade Secrets.

████████████████ **and Implied Covenant of Good Faith and Fair Dealing.**

198.    As a valid and enforceable contract under New York law, the Commitment Agreement contains an implied covenant of good faith and fair dealing which Klarna, Inc. breached through its conduct.

199.    That covenant prohibits a party from exercising its contractual rights in a manner that destroys or deprives the other party of the fruits of the contract, even where such conduct does not violate an express contractual provision.

200.    Here, the Commitment Agreement ███████████████████████



202.    As a result of its repudiation, ██████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

203.    Klarna, Inc.'s repudiation will thus harm Plaintiffs by ██████████

███████████████████████████████████

██████████

204.    As alleged above, these transactions depend on Klarna, Inc.'s cooperation, which

it understood when it agreed that Plaintiffs would arrange the First and Second Securitizations, and entered into advanced negotiations ███ ████████████████████████████████ ██████████ .

205.    Klarna, Inc. has, on information and belief, intentionally engineered an improper end-run around those obligations. By refusing to participate in these transactions — despite its role as sole supplier and servicer of those loans — ████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████ By doing so, Klarna, Inc. rendered its own contractual obligations illusory and unequivocally repudiated them, in bad faith, by depriving Pagaya Technologies of the core benefit of the bargain embodied in the Commitment Agreement.

███ ██ ████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████

**Failure to Pay** ████████████████

███    ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████

208.    Pagaya Technologies invoiced Klarna, Inc. for ████████████ owed for December 2025, which Klarna, Inc. has not paid. Klarna, Inc. has also failed to pay additional ██████████ owed for subsequent months, including January through March 2026 and any subsequent months through the date of this filing. To the extent invoices have not been provided for subsequent months, that is directly attributable to Klarna, Inc.'s refusal to provide the information necessary to generate an invoice.

209.    This failure to pay ██████████ constitutes a material breach of the Commitment

Agreement.

210.    As a direct and proximate result of these breaches of the Commitment Agreement by Klarna, Pagaya has suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor and grant the following relief:

1. Compensatory, consequential, punitive and / or other damages in an amount to be proven at trial;

2. Disgorgement of any unjust enrichment obtained by Klarna as a result of its unauthorized use of Pagaya's Trade Secrets;

3. A reasonable royalty for Klarna's ongoing unauthorized use of Pagaya's Trade Secrets that cannot be enjoined;

4. Exemplary damages, in an amount of up to twice the damages awarded above, on account of Klarna's willful and malicious misappropriation of Pagaya's Trade Secrets;

5. Injunctive relief and/or specific performance requiring Klarna to cease its use of any Pagaya Trade Secret or Confidential Information in any manner;

6. Plaintiffs' reasonable attorneys' fees as permitted by law;

7. Prejudgment and post-judgment interest at the maximum rate permitted by law;

8. An award of Plaintiffs' costs and expenses incurred in this action; and

9. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to D. Del. LR 38,1 and Fed. R. Civ. P. 38, Plaintiffs hereby demand a TRIAL BY JURY of all claims and issues presented in this Complaint that are so triable.

Dated: New York, New York
       May 13, 2026

                                       Respectfully submitted,

                                       */s/ Jacob R. Kirkham*

Jacob R. Kirkham
KOBRE & KIM LLP
600 North King Street, Suite 501
Wilmington, Delaware 19801
+ 1 302 518 6456
jacob.kirkham@kobrekim.com

Zachary D. Rosenbaum *(Pro Hac Forthcoming)*
George Stamatopoulos *(Pro Hac Forthcoming)*
Lydia L. Halpern *(Pro Hac Forthcoming)*
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
+1 212 488 1200
zachary.rosenbaum@kobrekim.com
george.stamatopoulos@kobrekim.com
lydia.halpern@kobrekim.com

*Attorneys for Plaintiffs*

*Additional Counsel for Plaintiffs*

Michael Ng
Daniel Zaheer
KOBRE & KIM LLP
150 California Street, 19th Floor
San Francisco, CA 94111
+1 415 582 4800
michael.ng@kobrekim.com
daniel.zaheer@kobrekim.com